**UNITED STATES of America, Appellee,**

v.

**Wolf JACOBOWITZ, a/k/a "Jack Rice," True Name: "Kalman Schlesinger," Defendant–Appellant.**

No. 905, Docket 88–1539.

United States Court of Appeals, Second Circuit.

Argued March 22, 1989.

Decided May 31, 1989.

cess devices, *i.e.*, credit cards, with intent to defraud, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1), and 2 (1982 & Supp. V 1987). He was sentenced to two years' imprisonment on one count, given a suspended sentence and four years' probation on the other count, and ordered to pay special assessments totaling $100. On appeal, Jacobowitz contends principally that the evidence was insufficient to convict him of "unauthorized" use of credit cards since their use had been agreed to by the cardholder, and that certain evidence was admitted at trial in violation of his constitutional rights. For the reasons below, we affirm.

## I. BACKGROUND

The events underlying the present prosecution were described at trial chiefly by Arthur Rice ("Rice"), the holder of the credit cards in question, testifying under a grant of immunity; two providers of services who identified Jacobowitz as having paid for services with Rice's credit cards; and Moshe Cassorla, who had assisted Jacobowitz in the use of the Rice cards. Viewed in the light most favorable to the government, the trial evidence showed the following.

On June 14, 1987, Rice was visited by his long-time acquaintance Mayer Weinberger, who requested a loan. Rice refused the loan but agreed to let Weinberger use his credit cards. He gave Weinberger two American Express cards and his Merrill Lynch and Bank of America money market account credit cards, with the understanding that Weinberger would charge items to the cards. Rice agreed to avoid calls from the credit card companies for several weeks and later to report the cards as lost, thereby causing the credit card companies to pay for the items charged by Weinberger. Rice thus understood that the cards would be used fraudulently to commit a crime.

On the same day, Jacobowitz showed Rice's credit cards to Cassorla and offered him 15% of the proceeds if Cassorla would pose as Rice and make charges and cash withdrawals on the cards. Jacobowitz did

Joan M. Azrack, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., David C. James, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Adina Schwartz, New York City (The Legal Aid Soc., Federal Defender Services Unit, New York City, on the brief), for defendant-appellant.

Before OAKES, Chief Judge, and KEARSE and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Wolf Jacobowitz appeals from a final judgment of the United States District Court for the Eastern District of New York following a jury trial before Edward R. Korman, *Judge*, convicting him on two counts of knowing use of unauthorized ac-

not reveal how he had obtained the cards or whether he knew Rice. Cassorla did not know Rice or Weinberger. When Cassorla agreed to participate, Jacobowitz gave him biographical information on Rice, including birth date, social security number, and mother's maiden name, and had Cassorla practice Rice's signature for several hours.

During the following week or so, Jacobowitz and Cassorla traveled around the country, with Cassorla posing as Rice and Jacobowitz posing as "Jack Rice," charging their hotel bills and airline tickets on Rice's credit cards. In their travels, which took them from New York to Cleveland, to Atlantic City twice, to several cities in Nevada, and finally back to New York, they used the Rice cards to purchase more than $7,500 worth of goods and services and to withdraw from banks and gambling casinos a total of some $56,000 in cash.

In Carson City, Nevada, Jacobowitz and Cassorla visited the Kit Kat Ranch, a prostitution establishment. They paid for the services of prostitutes with the Rice credit cards.

The purchases of goods and the cash withdrawals were physically made by Cassorla, with Jacobowitz generally remaining in the background to minimize the chances of his being photographed and identified. Jacobowitz instructed Cassorla to use public telephones rather than the telephones in their hotel rooms to avoid having the calls traced to them.

The spending spree ended in New York after Cassorla attempted to charge two $9,000 watches on one of the American Express cards. When American Express, contacted for telephonic approval of the transaction, wanted to speak with Cassorla and asked him several detailed personal questions, Cassorla became uneasy and abandoned the attempted purchase. When he described the event to Jacobowitz, Jacobowitz decided to terminate their operation.

In the meantime, about a week after Rice had given his credit cards to Weinberger, Merrill Lynch employees contacted Rice after noticing an unusual amount of activity on his money market credit card. Rice told them that the card had been lost and that he was not responsible for any of the charges. Merrill Lynch informed the government, and Secret Service Agent Dennis Letts began an investigation. Though Rice suggested that he might have lost his credit cards by leaving his wallet in his car when it went through a car wash on June 16, Letts soon discovered that this story was fabricated.

Rice then retained an attorney and refused to answer any further questions. He also refused to sign routine disclaimer affidavits sent to him by Merrill Lynch and Bank of America which stated, "I did not give anyone authorization to use my credit cards nor did I use them myself." Instead, Rice sent letters to these two companies stating that he did not request payment by them, and he later paid $60,000 for amounts charged on these two cards. American Express, however, never asked him for such a disclaimer, and Rice never admitted his responsibility for the approximately $20,000 worth of charges on those two cards. These charges were ultimately absorbed by American Express.

Letts followed the trail left by the transactions on Rice's credit cards and eventually tracked down Cassorla through surveillance photographs taken at a bank and a casino, and through telephone calls that Cassorla made to his sister from his room (notwithstanding Jacobowitz's precautionary instructions) in one of the hotels in which he and Jacobowitz had stayed. When Cassorla was arrested, he initially gave his name as "Jeffrey Bergman" and produced a driver's license and credit card in that name. He later confessed his true name and his participation in the credit card fraud scheme, though for a time he remained reluctant to reveal the identity of his partner in the scheme. Upon being informed, however, that the government knew Jacobowitz was the holder of an American Express card in the name of Jeffrey Bergman, Cassorla stated that the second person involved in the scheme was Kalman Schlesinger, using the name Wolf Jacobowitz.

Jacobowitz was indicted on four counts of unauthorized use of Rice's credit cards

with intent to defraud, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1), and 2, and on one count of conspiring with Weinberger for such use, in violation of 18 U.S.C. §§ 1029(b)(2) and 1029(c)(1). Jacobowitz was tried alone; Weinberger remained a fugitive at the time of trial.

At trial, Jacobowitz was identified by one of the prostitutes from the Kit Kat Ranch and by a travel agency employee who had obtained airline tickets for him and Cassorla in Cleveland. As discussed in greater detail in Part II.B.1. below, both of these witnesses had previously selected Jacobowitz's picture from photographic arrays.

The jury found Jacobowitz guilty on the two substantive counts charging unauthorized use of the American Express cards and acquitted him on the remaining counts. He was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Jacobowitz contends principally that he could not properly be convicted of "unauthorized" use of Rice's credit cards since Rice had authorized that use. In addition, he contends that the in-court identifications of him should not have been permitted because the pretrial photographic arrays shown to the witnesses were unduly suggestive, and that a statement he made in response to the government's request for handwriting exemplars should not have been admitted because it was elicited in violation of his Fifth and Sixth Amendment rights. We reject all of his contentions.

### A. The Meaning of "Unauthorized" Access Device

Jacobowitz argues that the evidence was insufficient to convict him of unauthorized use of Rice's credit cards because Rice authorized their use. Though phrased as a sufficiency-of-the-evidence argument, this is in reality a contention that the statute simply does not reach a credit card fraud that is perpetrated against the issuer of the card with the connivance of the cardholder. However the contention is phrased, we reject it.

Section 1029(a)(2) of 18 U.S.C. makes it unlawful to "knowingly and with intent to defraud[,] traffic[ ] in or use[ ] one or more unauthorized access devices during any one-year period, and by such conduct obtain[ ] anything of value aggregating $1,000 or more during that period." The term "access device" includes credit cards, see 18 U.S.C. § 1029(e)(1), and an "unauthorized access device" is defined as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud," id. § 1029(e)(3). Since the credit cards at issue in the present case were not lost, stolen, expired, revoked, or canceled, Jacobowitz was properly convicted only if the cards were "obtained with intent to defraud."

The statute does not specify from whom cards within the reach of this final phrase of § 1029(e)(3) must have been "obtained" or who must have been the intended victim of the fraud. Jacobowitz would have us rule that this phrase reaches only cards obtained by the cardholder with intent to defraud the issuer or obtained by a third person from the cardholder with intent to defraud the cardholder. While we think it plain that both of these combinations are within the statute, we see no basis on the face of the statute to exclude acquisition by a third person from the cardholder with intent to defraud the issuer. Certainly the language of the section is not so limited, and the issuer is an obvious potential victim that Congress might have wished to protect. For example, other parts of the definition of unauthorized access device that focus on cards that have been "revoked, or canceled" seem plainly designed to protect the interests of the issuer. Cf. United States v. Blackmon, 839 F.2d 900, 913–15 (2d Cir.1988) (dictum) (construing "intent to defraud" as used in 18 U.S.C. § 1029(a)(3) (fraudulent possession of 15 or more unauthorized access devices) to mean "intent to defraud a credit card holder or credit card company" (emphasis added)). Nothing in the statute itself indicates that we should interpret "obtained with intent to defraud" in a way that does not protect the issuer or that

diminishes its protection by requiring direct contact between the issuer and the defrauder.

■ The legislative history supports the conclusion that Congress intended § 1029 to prohibit a third party's use of a credit card to defraud the issuer with the consent of the cardholder, even though the latter had obtained the card without intent to defraud the issuer. Prior to 1984, fraudulent use of credit cards was prosecuted under a section that made it unlawful to

> knowingly in a transaction affecting interstate or foreign commerce, use[ ] or attempt[ ] or conspire[ ] to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain money, goods, services, or anything else of value which within any one-year period has a value aggregating $1,000 or more.

15 U.S.C. § 1644(a) (1982). Section 1644 was interpreted not to reach situations such as the present one. Thus, in *United States v. Kasper*, 483 F.Supp. 1208 (E.D. Pa.1980), where the parties had stipulated

> that credit cards were obtained by the original cardholders without the intent to defraud the issuing companies, sold or given to [the defendants] with the knowledge of the persons to whom the cards were originally issued that [the defendants] would use the cards to make charges without paying for them, and then reported as lost or stolen by the original cardholders,

*id.* at 1210, the court held there was no violation of § 1644. *Cf. United States v. Kay*, 545 F.2d 491, 493 (5th Cir.) (conviction under § 1644 sustainable because jury could reasonably conclude that cardholder made fraudulent misrepresentations "at the time he applied for the cards"), *cert. denied*, 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed. 2d 94 (1977).

Section 1029 was enacted in 1984. In discussing the need for new legislation, a report of the Senate Committee on the Judiciary, citing *United States v. Kasper*, noted, *inter alia*, the "concern ... that, under existing case law, an individual who acquired a card that has been lawfully is-

sued to another for use in fraudulently obtaining goods or services is not subject to prosecution." S.Rep. No. 368, 98th Cong., 2d Sess. 5 ("Senate Report"), *reprinted in* 1984 U.S.Code Cong. & Ad. News ("USCCAN") 3647, 3651. In order to close this perceived loophole, the Senate bill prohibited the transfer of any "fraudulent payment device," which was defined principally to encompass an access device that was "counterfeit, fictitious, altered, forged, lost, stolen, incomplete, expired, revoked, canceled, fraudulently obtained or obtained as part of a scheme to defraud." S. 1870, 98th Cong., 2d Sess. § 1029(d)(2), 130 Cong.Rec. 9864 (1984). In explaining the thrust of a proposed section that "would make it a Federal offense to knowingly and with intent to defraud, produce, buy, receive, sell or transfer a fraudulent payment device," the Senate Report stated that "'[w]ith intent to defraud' means that the offender has a conscious objective, desire or purpose to 'deceive another person ....'" It does not, however, require that the offender have direct contact with the person who is ultimately defrauded." Senate Report at 6, USCCAN at 3652.

In the House of Representatives, a somewhat different bill was introduced, as the House focused to a greater extent on counterfeit access devices than on genuine access devices obtained by fraud. *See* H.R. Rep. No. 894, 98th Cong., 2d Sess. ("House Report"), *reprinted in* 1984 USCCAN 3689. The House bill defined "counterfeit" devices and "unauthorized" devices separately, and its definition of the latter term is the definition that was eventually included in § 1029. The House Report described "unauthorized" access devices as "genuine access devices being used without authority." *Id.* at 14, USCCAN at 3700; *see also id.* at 17, USCCAN at 3703 ("genuine but being misused (unauthorized)"). We have found no indication that the House did not share the intent of the Senate to prohibit fraud on the issuer by a person who obtains a validly issued card from the cardholder with his consent. *Cf. id.* at 17, USCCAN at 3703 (House bill contains "no

requirement" that a counterfeiter "have direct contact with the person who is ultimately defrauded"). There can be no doubt that the House was concerned with frauds perpetrated upon the issuing companies, *see* House Report at 4, USCCAN at 3689–90 ("[f]inancial institutions claim that they lost $128 million from bank card fraud in 1982," two-thirds of which resulted from unauthorized use of genuine devices); *id.* at 6–7, USCCAN at 3692–93. In sum, the House and Senate reports reveal an intent to protect the issuer from credit card frauds and do not suggest any intent not to protect the issuer from third-party frauds of the type in question here.

The so-called conference report relied on by Jacobowitz provides no sound basis for giving § 1029 a more restrictive reading. There was no traditional conference report explicating the differences between the House and Senate bills. Apparently the only later report mentioning the provision that was to become § 1029 was H.R.Conf. Rep. No. 1159, 98th Cong., 2d Sess. 233, *reprinted in* 1984 USCCAN 3710, which contained a joint statement to the House and Senate with regard to continuing appropriations for the Omnibus Crime Control Act. In a five-page section of this report discussing a wide variety of matters including sentencing, black market pharmaceuticals, child abuse, and salaries for United States Attorneys, there was one paragraph on the new credit card provisions. It stated that the compromise agreed to by the House and Senate

> [p]rohibits use, production and trafficking in "counterfeit" credit cards and credit card production equipment with intent to defraud. It prohibits use and trafficking in "unauthorized" credit cards which are valid cards that have been lost or stolen.

*Id.* at 418, USCCAN at 3714. Needless to say, this abbreviated description of "unauthorized access devices" cannot substitute for the more extensive language that was enacted into law as § 1029(e)(3). Nor, given its brevity, does this description significantly aid our interpretation of that provision.

We conclude that both the language and the legislative history support the proposition that even as to a credit card obtained by the cardholder from the issuer without fraudulent intent, use of that card by a third person with the consent of the holder to defraud the issuer violates § 1029(a)(2).

B. *The Constitutional Claims*

Jacobowitz also contends (1) that his identification by two witnesses at trial denied him due process because the photographic arrays shown them prior to trial were unduly suggestive and because other factors indicated that the identifications were unreliable; and (2) that the court should have suppressed evidence of his refusal to give a handwriting exemplar in the name of "Kalman Schlesinger." These claims have no merit.

1. *The Identification Evidence*

At trial, Jacobowitz was identified by two witnesses: Sheila Scott, the travel agency employee who had obtained airline tickets for Jacobowitz and Cassorla in Cleveland, and Danielle Cobbs, one of the prostitutes whose services they had engaged at the Kit Kat Ranch. Both witnesses had previously selected Jacobowitz's picture from photographic arrays. Jacobowitz contends that their in-court identifications should not have been permitted because the other photographs included in the arrays so differed from his own that the arrays were impermissibly suggestive. We disagree.

Generally, pretrial photographic identification procedures violate due process only if they are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *see Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Jarrett v. Headley*, 802 F.2d 34, 40–41 (2d Cir.1986). "[R]eliability is the linchpin in determining the admissibility of identification testimony" for both pretrial and in-court identifications. *Manson v. Brathwaite*, 432 U.S. 98, 106–07 n. 9, 114, 97

S.Ct. 2243, 2248–49 n. 9, 2253, 53 L.Ed.2d 140 (1977). A photographic array may be unfair if the defendant's picture was the only one that matched the witnesses' descriptions or "so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984)).

We find no due process violation here. We have reviewed the photographic arrays presented to Scott and Cobbs, *see United States v. Archibald*, 734 F.2d at 940; *see also United States v. Sanchez*, 603 F.2d 381, 384 (2d Cir.1979), and conclude that the photographs are suitably similar and that Jacobowitz's picture does not stand out from the others.

■ Further, though our conclusion that the photographic array was not suggestive eliminates the need to inquire into the indicia of reliability surrounding Scott's and Cobbs' identifications, *see Jarrett v. Headley*, 802 F.2d at 42; *United States v. Bubar*, 567 F.2d 192, 198–99 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977), we note that the reliability of each witness's identification was indicated by virtually all of the factors listed in *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382–83, to wit, "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, [and] the level of certainty demonstrated by the witness at the confrontation"; *see id.* (remaining factor is length of time between crime and confrontation). *See also Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. Each witness's description of Jacobowitz, though not highly detailed, was accurate. Scott, for example, described his height, build, skin tone, hair and eye color, and general appearance. Though Cobbs' description was more cursory, neither witness mentioned characteristics not possessed by Jacobowitz. Neither witness required more than a minute or so to select Jacobowitz's photograph from the array or

showed uncertainty in doing so, and each had had sufficient opportunity to observe Jacobowitz and sufficient reason to remember him. Scott had been in Jacobowitz's presence for approximately five minutes in good lighting at the hotel travel center booth and saw him again briefly when she delivered the tickets to his room; she remembered him in particular because it was the first time she had ever delivered tickets to a customer's hotel room. Cobbs, although she was the "date" of Cassorla rather than Jacobowitz, had spent several minutes with Jacobowitz in a jacuzzi and additional time with him during a discussion of fees; she remembered Jacobowitz because that was the first time she had "partied" with the coworker who was Jacobowitz's "date" and she had had a dispute with the coworker as to whether their rates were the same for credit transactions as for cash.

As to the remaining *Neil v. Biggers* factor, we note that there was a 10–month interval between the witnesses' encounters with Jacobowitz and their viewing of the array. Though this was a longer delay than is desirable, *see, e.g., Neil v. Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 (seven-month lapse "a seriously negative factor in most cases"), that factor was outweighed by the other indicia of reliability. *See id.* at 200–01, 93 S.Ct. at 382–83 (other circumstances indicating reliability may offset long delay); *United States v. Williams*, 596 F.2d 44, 49 (2d Cir.) (even 32–month delay may be offset by factors demonstrating strong reliability), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

In sum, we conclude that the witnesses' identifications of Jacobowitz were admissible.

2. *Postindictment Statements Regarding Handwriting Exemplars*

After Jacobowitz was indicted and arraigned, the government asked him to provide a handwriting exemplar not only of the name "Wolf Jacobowitz" but also of "Kalman Schlesinger." Jacobowitz responded that he could not write "Kalman

Schlesinger" in script and could only print it. Jacobowitz unsuccessfully moved prior to trial to suppress this exchange on the grounds that it violated his constitutional rights. On appeal, he pursues the contentions that (a) because no *Miranda* warnings were given in connection with the request for exemplars, the elicitation of his response violated his Fifth Amendment privilege against self-incrimination, and (b) because his attorney was not present, the elicitation also violated his Sixth Amendment right to counsel. We reject both contentions.

While the Fifth Amendment privilege against self-incrimination bars compelled communication, it does not prevent the government from compelling a defendant to give "'real or physical evidence.'" *Schmerber v. California*, 384 U.S. 757, 763–64, 86 S.Ct. 1826, 1831–32, 16 L.Ed.2d 908 (1966); *see Gilbert v. California*, 388 U.S. 263, 266–67, 87 S.Ct. 1951, 1953–54, 18 L.Ed.2d 1178 (1967). Though the "content" of a handwriting exemplar may receive some Fifth Amendment protection, *see Gilbert v. California*, 388 U.S. at 266–67, 87 S.Ct. at 1953–54, as it would if the government sought "written answers to incriminating questions or a signature on an incriminating statement," *United States v. Mara*, 410 U.S. 19, 22 n. *, 93 S.Ct. 774, 776 n. *, 35 L.Ed.2d 99 (1973) (dictum), "[a] mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside of [the Fifth Amendment's] protection." *Gilbert v. California*, 388 U.S. at 266–67, 87 S.Ct. at 1953–54; *see Schmerber v. California*, 384 U.S. at 764, 86 S.Ct. at 1832 (dictum) (no protection against compulsion to write for identification).

■ Handwriting exemplars may permissibly be taken of possible aliases or other potentially incriminating names. *See United States v. Doe*, 405 F.2d 436, 438 (2d Cir.1968) (handwriting exemplar reproducing instrument used to commit the crime); *see also United States v. Euge*, 444 U.S. 707, 716, 718, 100 S.Ct. 874, 880, 881, 63 L.Ed.2d 141 (1980) (handwriting examp-

lars used by IRS to determine if particular name is an alias of taxpayer); *United States v. Doe*, 457 F.2d 895, 896 (2d Cir. 1972) (dictum) (handwriting exemplars of names or words used in commission of crime), *cert. denied*, 410 U.S. 941, 93 S.Ct. 1376, 35 L.Ed.2d 608 (1973). Since a handwriting exemplar may properly be compelled, the defendant's refusal to comply may constitute circumstantial evidence of guilt and usually will be admissible in trial. *See United States v. Doe*, 405 F.2d at 438–39 (refusal to provide handwriting exemplars is admissible); *see also United States v. Wolfish*, 525 F.2d 457, 461 (2d Cir.1975) (effort to disguise handwriting is admissible), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976).

The record in the present case indicates that the government asked not for a communicative statement but only for a simple exemplar of Jacobowitz's writing of the name "Kalman Schlesinger." Since Jacobowitz had no privilege to refuse to provide this exemplar, neither the request nor the admission in evidence of his refusal violated his Fifth Amendment rights.

■ Jacobowitz's Sixth Amendment claim has no greater merit. Even if such a claim is not foreclosed by the Court's reasoning in *Gilbert v. California*, 388 U.S. at 267, 87 S.Ct. at 1953 (where the defendant had not yet been indicted, "[t]he taking of the exemplars was not a 'critical' stage of the criminal proceedings entitling [the defendant] to the assistance of counsel"); *see also* W. LaFave & J. Israel, 1 *Criminal Procedure* § 7.3 at 570 (1984) ("while the suspect might benefit from counsel's advice as to whether to give the exemplars or refuse and suffer the consequences, this does not involve a constitutional right to which the right to counsel might be linked") (footnotes omitted), Jacobowitz's claim that he was denied counsel is not factually supported by the record.

Though Jacobowitz's attorney was not present when the exemplars were to be given, her absence is not attributable to the government. The attorney had been served with the subpoena requesting exemplars. She presumably knew or should

have anticipated that one of the names that might be requested would be "Kalman Schlesinger," since the indictment attributed this name to Jacobowitz, and prior to his arrest Jacobowitz had been asked about his use of this name. Indeed, the attorney had earlier moved to strike the name "Kalman Schlesinger" and other alleged aliases from the indictment. The attorney was in fact present with the defendant and the government agents just prior to the taking of the exemplars but departed before this occurred.

In all the circumstances, we conclude that the district court properly denied Jacobowitz's motion to suppress the evidence of his refusal to give handwriting exemplars.

### CONCLUSION

We have considered all of Jacobowitz's contentions on appeal and find them to be without merit. The judgment of conviction is affirmed.