United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 96-3270

_____

United States of America,               *
                                        *
                Appellee,               *
                                        *   Appeal from the United States
        v.                              *   District Court for the
                                        *   Eastern District of Arkansas.
Susan H. McDougal,                      *
                                        *
                Appellant.              *

_____

Submitted:  April 17, 1997
        Filed:  February 23, 1998

_____

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Susan McDougal appeals her conviction on four counts arising out of a $300,000 Small Business Administration loan from Capital Management Services to her, doing business as Master Marketing, a sole proprietorship. She was convicted of mail fraud for submitting a false Small Business Administration Form 1031 in connection with the loan, in violation of 18 U.S.C. § 1341 (1994) (Count 13); of aiding and abetting in the misapplication of the funds from the loan, in violation of 18 U.S.C.A. § 657 (West Supp. 1997) (Count 14); of aiding and abetting the making of a false entry in the reports and statements of Capital Management Services, which stated  that the purpose of the

loan was for operating expenses of Master Marketing, when it was known that the proceeds would not be so used, in violation of 18 U.S.C. § 1006 (1994) (Count 15); and of aiding and abetting in making a false statement for the purpose of influencing the actions of Capital Management Services by falsely representing that the purpose of the loan was to provide operating capital for Master Marketing, in violation of 18 U.S.C.A. § 1014 (West Supp. 1997) (Count 16).[1]  Susan McDougal argues that her convictions should be reversed because:  (1)  there was insufficient evidence to convict her; (2) co-conspirator hearsay statements were admitted and the district court[2] failed to grant a mistrial after dismissal of the conspiracy charges; (3) the court admitted extraneous act evidence; (4) the district court gave erroneous, incomprehensible and mutually exclusive jury instructions; (5) the prosecutors made statements during the trial and closing arguments which amounted to comment about Susan McDougal's failure to testify and call witnesses; (6) the government made improper use of expert opinion testimony; and, finally (7) the trial was tainted by cumulative error.  We affirm.

Trial testimony was that David Hale was president of Capital Management Services, a small business investment company, which lent money supplied by the Small Business Administration.   James McDougal was the Chairman of the Board of Madison Guaranty Savings and Loan, and Susan McDougal, his wife, was Senior Vice President, corporate secretary and board member.

At James McDougal's direction, Madison Guaranty loaned a straw man monies to buy some property from Hale at an inflated price.  The purpose of this transaction

---

[1]In addition, the district court, at the close of the government's case-in-chief, acquitted Susan McDougal of a conspiracy count, charging, among other things, conspiracy to misapply the funds of Capital Management Services, and three other substantive counts pertaining to different transactions.

[2]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

was to raise money for Hale to invest in Capital Management in order to increase Capital Management's lending limit to $300,000. Around the same time James McDougal told Hale that McDougal needed a loan from Capital Management. To borrow money from a small business investment company, a borrower had to present an application from which the investment company could determine the purpose of the loan. Small Business Administration regulations prevented the investment companies from loaning money for the purchase of raw land or to pay off other loans. Hale said James McDougal told him, "[W]e're going to want to put the loan in Susan's advertising company." Hale testified that James McDougal brought him an application for a loan for Susan McDougal, doing business as Master Marketing, a sole proprietorship.

The application for the Master Marketing loan stated that it was an advertising and public relations consulting firm doing business at 1310 Main Street in Little Rock, with Susan McDougal, a well known Little Rock advertising personality, as sole owner. Further, it stated that in 1985, her third year in advertising, Ms. McDougal had the sole responsibility for production of T.V., radio, and newspaper advertising for several successful advertising campaigns with gross billings in excess of $1,500,000. The application stated that the loan proceeds would be used to sustain and service current clients, add new clients, and expand client services. Twenty percent of the funds would be used for office and technical equipment, and the balance for operating capital. The loan was needed because the nature of the business required advance payments for media time purchased, creating heavy capital requirements to cover the cash flow demands arising from delay between the time the firm paid for media buys and subsequent collection from the firm's clients.

Hale testified that he used the information James McDougal supplied in the Master Marketing loan application to prepare documentation for the loan, including the note guaranty, and various Small Business Administration forms. In particular, Hale relied on the application in preparing the Small Business Administration Form 1031, which the Administration uses for purposes of regulatory oversight. The Form 1031

stated that the purpose of the loan was to provide "working capital" to Master Marketing. Hale stated that he knew when he filled out the Form 1031 that the loan proceeds would not be used for working capital for Master Marketing.

Hale testified that he prepared the loan documentation and laid it out on a table. On April 3, 1986, Susan McDougal came into his office, reviewed the documents, asked Hale a few questions about them, and then signed all the documents requiring her signature. The Form 1031 was with the other documents for her review. She then accepted the $300,000 check, made payable to "Susan H. McDougal d/b/a/ Master Marketing." She did not endorse the check, but it was deposited in James and Susan McDougal's personal checking account at Madison Guaranty Savings and Loan five days later.

Over the next two months, the $300,000 deposited in the McDougals' personal account was all spent. The government introduced evidence of how the money was spent. It summarizes that evidence as showing the McDougals used $153,370.57 for payments on their existing loans; $28,019.71 for renovations or loans on their house; $45,000 to buy new land; $14,660 for Susan McDougal's brother's political campaign; and $58,199.26 for other expenses, such as apartment rental, housekeeping, utilities, gasoline, dry cleaning, groceries, professional fees for accounting, medical, title and interior decorating services, and department store and credit card accounts. Although these are slightly different categories than the government's witness used at trial, Susan McDougal does not contest the government's summarization of the expenditures.

Hale testified that in May or June 1986 James McDougal came to Hale's office unexpectedly. Hale said McDougal was "real frightened" and wanted to see the file on the Master Marketing loan. James McDougal said he was going to have to "change the purpose out." He had prepared another loan application.

The second application described Master Marketing as a "general purpose real estate brokerage and land development firm with Susan McDougal, a well-known Little Rock real estate executive, as sole owner." It described her ten years' experience in real estate sales and development, as well as her advertising activities. This application stated that Master Marketing was located at 1308 Main Street in Little Rock, whereas the first application gave the address as 1310 Main. The new application said $107,000 would be used to extend water and sewer lines to 127 lots in one real estate development and the balance used to complete surveying and road building on another 700-acre property.

Hale told James McDougal that he could not switch applications because the second application would not match the Form 1031 already filed with the Small Business Administration. Hale took the substitute application and placed it in another file, so that auditors would not see it, note the discrepancy with "the other document," and launch an investigation.

The government introduced evidence directed to the existence of Master Marketing. The government established that people who would be expected to know about Master Marketing, if it had been doing business, knew nothing about it.

Susan McDougal had in fact participated in various advertising campaigns for Madison Guaranty and Madison Financial Corporation, but these activities had been handled through an entity known as Madison Marketing. The advertising agency that Madison Guaranty used during that time dealt with Susan McDougal through Madison Marketing and was paid by checks drawn on the Madison Marketing bank account. The head of that advertising agency, Chester Storthz, told the FBI in June 1994 that he had never heard of "Master Marketing."

The McDougals' accountant, Charles James, identified the McDougals' 1985 and 1986 tax returns, which showed no Schedule C for "Master Marketing" and no income

for it (although they did show income for "Madison Marketing"). James testified he had never heard of Susan McDougal doing business as Master Marketing. Kirby Randolph, the employee at Madison who handled the McDougals' personal bank accounts, never kept an account for "Master Marketing." Greg Young, the comptroller at Madison Guaranty, who was responsible for processing invoices and bills for payment, never received any invoices payable to Master Marketing and had never heard of it. Lisa Armstrong, who worked for Madison Marketing, had heard of Master Marketing, but did not know of it as a going concern. Susan McDougal had told her in October 1995 that Master Marketing was the predecessor to Madison Marketing, but this was all Lisa Armstrong knew about it. Armstrong never saw stationery or business cards with the name "Master Marketing."

Susan McDougal later confirmed that she was responsible for the Master Marketing Loan. In response to an audit inquiry, she signed a confirmation of the $300,000 debt owed by Master Marketing to Capital Management as of June 30, 1986. David Hale received a letter dated April 3, 1987 on Master Marketing stationery, imprinted with Susan McDougal's home address. The letter stated:

> Reference is made to the note payment I now have due at Capitol [sic] Management Services, Inc. Because of the fluctuation between payment of media expenses and reimbursement, it will be 30 to 60 days before I can make this payment to you.

The letter was signed "Susan McDougal" and included a handwritten "Thank you."

The Small Business Administration sent Susan McDougal a questionnaire about her loan. She filled out the form, writing in that the proceeds of the loan were used for

"Operating Capital."  She identified the owner of the company as "Susan H. McDougal, sole proprietorship."[3]

The McDougals made no payments on the Master Marketing loan, other than to give Capital Management a power of attorney on their already-encumbered Madison Guaranty stock, from which Hale never realized any money.  Although Hale obtained a consent judgment against Susan McDougal, Hale never collected any payments on the Master Marketing loan.

## I.

Susan McDougal argues that the evidence was insufficient to convict her.  First, she argues that her convictions on the Master Marketing count were inconsistent with the district court's order dismissing the conspiracy count against her, because the Master Marketing transaction was alleged as one of the overt acts in furtherance of the conspiracy.  We will not belabor this argument, since there is no inherent inconsistency between acquittal on conspiracy charges and conviction on substantive charges for the same underlying crimes, even aiding and abetting.  See United States v. Fesler, 781 F.2d 384, 390 (5th Cir.) ("Conspiracy and aiding and abetting are entirely separate crimes, so that acquittal on one does not implicate the remaining charge."), cert. denied, 476 U.S. 1118 (1986).

> The two crimes involve distinct standards of proof:  [conspiracy] requires "proof of a conspiratorial agreement," while [aiding and abetting]  requires proof merely that a defendant "in some way associate himself with the venture, that he participate in it . . . [and] that he seek by his action to make it succeed."

---

[3]Susan McDougal stipulated that she had signed the letter to Capital Management, the audit inquiry, and the Small Business Administration questionnaire.

United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986) (citations omitted), aff'd, 484 U.S. 19 (1987).

In this case, moreover, the subject of the conspiracy was much wider and more complex than the substantive crimes for which Susan McDougal was convicted. It is true that among the overt acts alleged in the conspiracy charge is the preparation of fraudulent loan applications for the $300,000 loan to be made to Susan McDougal, d/b/a Master Marketing, and Susan McDougal's completion of the loan papers and receipt of the proceeds, which were deposited into the McDougals' joint account. This, however, is one small part of the complex conspiracy for which Tucker and James McDougal were convicted. The district court found that a conspiracy existed, but that Susan McDougal was not a party to the conspiracy. The same district court found that there was sufficient evidence that Susan formed part of a "scheme to defraud" by her actions in the Master Marketing transaction. Because the substantive crimes alleged in Counts 13, 14, 15 and 16 may stand independently of the conspiracy, Susan McDougal cannot use the dismissal of the conspiracy charge against her to invalidate the substantive charges on which she was convicted.

Second, Susan McDougal argues that all four substantive charges on which she was convicted are based on the Master Marketing loan. She contends that there was insufficient evidence to show that she had anything to do with the Master Marketing loan application, that at the time of the loan she had no knowledge of any improprieties, that she did not endorse the check she received, and that she had no means of knowing that the check was deposited to her account.

In reviewing a claim of insufficiency of the evidence, we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in support of the jury's verdict. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Liebo, 923 F.2d 1308, 1311 (8th Cir. 1991). We must uphold the verdict if any reasonable jury could have found the

elements of the crime beyond a reasonable doubt.  <u>Liebo</u>, 923 F.2d at 1311. Conversely, we will reverse only if the jury must have had a reasonable doubt about an essential element of the crime.  <u>Id.</u>

Count 13 of the indictment alleged mail fraud in connection with the Master Marketing loan, in violation of 18 U.S.C. § 1341.[4]  Count 13 alleged that Susan and James McDougal submitted a false loan proposal to Capital Management Services, stating that Master Marketing was a "general purpose advertising and public relations consulting firm" and that the loan proceeds were to be used for operating capital.  Count 13 alleged that those statements were not true, in that Master Marketing was not an ongoing business and the McDougals did not intend to use the loan proceeds for Master Marketing.  The McDougals placed the loan proceeds in their joint account and spent the money on items wholly unconnected to any business called "Master Marketing."  The indictment charged that the McDougals caused the false statements to be incorporated in the Form 1031 required by the Small Business Administration and that they caused the Form 1031 to be mailed in order to carry out their scheme to defraud. Count 14 alleged that Susan and James McDougal and David Hale willfully misapplied the proceeds of the loan, as the loan was made for operating expenses of Master Marketing, when the McDougals knew that the loan proceeds would not be

---

[4]18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . for the purpose of executing such scheme . . . places in any post office . . . any matter or thing whatever to be sent or delivered by the Postal Service . . . or knowingly causes to be delivered by mail . . . any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

used for that purpose, in violation of 18 U.S.C.A. § 657[5] and 18 U.S.C. § 2.[6]  Count 15 alleged Susan and James McDougal and David Hale caused a false entry to be made in the reports and statements of Capital Management Services regarding the purpose of the loan to Susan McDougal, when they knew that the proceeds would not be used for the purpose stated, in violation of 18 U.S.C. § 1006[7] and 18 U.S.C. § 2.  Count 16 charged that the McDougals and David Hale made a false statement for the purpose of influencing the actions of Capital Management Services.  They represented the purpose

---

[5]18 U.S.C.A. § 657 provides:  "Whoever, being an officer, agent or employee of . . . any small business investment company . . . embezzles, abstracts, purloins, or willfully misapplies any moneys . . . belonging to such institution . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both . . . ."

[6]18 U.S.C. § 2 provides:

(a)  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures it commission, is punishable as a principal.

(b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Aiding and abetting liability requires that:  (1) the defendant associated himself with the unlawful venture; (2) he participated in it as something he wished to bring about; and (3) he sought by his actions to make it succeed.  See United States v. Lanier, 838 F.2d 281, 284 (8th Cir. 1988) (per curiam).

[7]18 U.S.C.A. § 1006 provides:

Whoever, being an officer, agent or employee of or connected in any capacity with . . . any small business investment company, with intent to defraud any such institution . . . makes any false entry in any book, report or statement of or to any such institution. . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

of the loan as operating capital for Master Marketing, when they knew that the loan proceeds would not be so used, in violation of 18 U.S.C.A. § 1014[8] and 18 U.S.C. § 2.

In ruling on Susan McDougal's post-trial motion to acquit, the district court stated that the jury could find that Susan was involved in a scheme to defraud. The court stated:

> Susan picked up the $300,000.00 check from CMS, she signed all of the CMS loan documents for the loan, and she took the loan proceeds and deposited them into her personal account with McDougal at MGSL. The entire $300,000.00 was spent on personal expenditures, not on anything related to Master Marketing. Thus, the jury could reasonably conclude that the money was not spent as described in either of the fraudulent loan applications submitted to CMS for the $300,000.00 loan.
>
> Furthermore, the jury could find that Susan was involved in the scheme by her attempts to conceal the true use of the proceeds, and that Hale's mailing of SBA Form 1031 for the loan to Susan McDougal d/b/a Master Marketing, was part of the fraudulent scheme.

These observations of the district court are fully supported by the record. Susan McDougal went alone to Capital Management to pick up the $300,000 check, reviewed and signed the loan documents, and asked questions about the SBA forms. Her accountant, bookkeeper and other people who ought to have known of Master

---

[8] 18 U.S.C.A. § 1014 provides:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . a small business investment company . . . upon any . . . loan . . . shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Marketing if it existed, did not know of her doing business in that name. The loan check was deposited in the McDougals' personal account, rather than a "Master Marketing" account, and the entire proceeds were spent within two months on the McDougals' personal and business expenses, none of which had anything to do with Master Marketing.

Three months after Susan McDougal obtained the loan, she confirmed the loan amount for Capital Management's auditors. A year later, she signed a letter containing a statement that she could not make payment on the loan for 30 to 60 days because of the fluctuation between payment of media expenses and reimbursement. This perpetuated the representation made in the loan application, i.e., that the loan funds "are required for operating capital as the nature of applicant's business often requires advance payment for media time purchased thus creating heavy capital requirements to cover the cash flow demands arising from the delay between the time the firm pays for media buys and subsequent collection from the firm's clients." The same month she sent that letter, she also signed a Small Business Administration questionnaire confirming that the proceeds of the loan were used as operating capital and identifying herself as the only person associated with Master Marketing. The only evidence was that the loan proceeds were not so used. We must view this evidence in the light most favorable to the government, resolving all issues of credibility in favor of the government. The evidence is sufficient to sustain the convictions.

Susan McDougal also argues that the mail fraud charge, Count 13, was predicated on the mailing of the Small Business Administration Form 1031, but that David Hale made that mailing on April 9, 1986, after she had received the $300,000 check on April 3, 1986. She argues that the scheme had then reached fruition and the later mailing was not in execution of the scheme as required by Kann v. United States, 323 U.S. 88, 93-94 (1944), Parr v. United States, 363 U.S. 370, 392-93 (1960), and United States v. Maze, 414 U.S. 395, 403 (1974). The Supreme Court in Schmuck v. United States, 489 U.S. 705, 715 (1989), stated that the relevant question is whether

-12-

the mailing is part of the execution of the scheme as conceived by the perpetrator at the time of the fraudulent transaction. We have held recently that even a mailing that became necessary after the defendant "has successfully fleeced his victim" can come within the statute if the mailing is necessary to permit the defendant to "retain the fruits of [the] fraud." See United States v. Pemberton, 121 F.3d 1157, 1171 (8th Cir. 1997). Accord United States v. Lack, 129 F.3d 403, 408 (7th Cir. 1997) ("This court has also held on several occasions that mailings which occur after the defendant has obtained the victims' money are in furtherance of the scheme if they facilitate concealment or postpone investigation of the scheme.")

In this case, there was evidence that the Form 1031 was part of the scheme from the outset. Hale testified that he had to send in the Form 1031 to convince the Small Business Association his loans were proper; otherwise the SBA could "write you up for it." The Form 1031 was part of the loan documentation he prepared at the time he originated the loan and was with the loan documents for Susan McDougal's review at the closing. His mailing of the form was certainly foreseeable. See United States v. Lefkowitz, 125 F.3d 608, 615 (8th Cir. 1997) (third party's use of mail or wire "reasonably foreseeable" result of fraud), pet'n for cert. filed, No. 97-7511 (Jan. 13, 1998).

Moreover, mailing the form was necessary to allow McDougal "to retain the fruits of [the] fraud." See Pemberton, 121 F.3d at 1171. An SBA official testified that the Form 1031 served to allow the SBA to verify that the loans complied with its regulations. Mailing the Form 1031 with false information about the purpose of the loan was a required step in the process of gaining Susan McDougal quiet enjoyment of the money, since if Hale had not complied with the regulatory requirement of sending in necessary forms with information indicating the loan was for the operation of a small business, he could have prompted investigation.

In sum, the mailing was not "innocent," but contained false statements; the mailing of the Form 1031 was contemplated from the outset by a participant in the scheme as a necessary step; the mailing was done by a party to the scheme; and the item was mailed to the victim of the fraud to prevent detection. These facts amply satisfy the requirement that the mailing be done in execution of the fraud. Cf. United States v. Ribaste, 905 F.2d 1140, 1142 (8th Cir. 1990) (in scheme to obtain GM dealership by false representations, GM's mailing of acceptance letter satisfied mailing element) and United States v. Reed, 47 F.3d 288, 290-91 (8th Cir. 1995) (attorney and accountant raided trust account over a long time; bank's mailing of account statements to defendants satisfied mailing element because defendants relied on statements in carrying out fraud). We reject Susan McDougal's argument.

## II.

Susan McDougal argues that when the district court dismissed the conspiracy count against her at the close of the government's case in chief, the district court erred in refusing to grant her a mistrial on the ground that co-conspirator hearsay had been conditionally admitted. Susan McDougal identifies fifty-eight instances of what she contends was co-conspirator hearsay. She argues that she objected on numerous occasions and the court gave cautionary instructions, but that on numerous instances there was no such cautionary instruction. She argues that as to the occasions when she did not object, plain error exists. She argues further that the prejudice to her was compounded by the fact that during jury deliberations the district court allowed the jury to have an unredacted copy of the indictment with the conspiracy allegations intact, as well as the exhibits in the case and an exhibit list.

Under United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978), upon objection to testimony proffered as co-conspirator hearsay, F.R. Evid. 801(d)(2)(E), the court may conditionally admit the evidence with a cautionary instruction. If the government fails to prove that there was conspiracy, the court must then decide

-14-

whether an instruction to disregard the provisionally admitted evidence is adequate or whether the defendant's rights have been so prejudiced that a mistrial is necessary. Bell, 573 F.2d at 1044; United States v. Greene, 995 F.2d 793, 800 (8th Cir. 1993). The district court's decision that a mistrial is or is not necessary is reviewed only for abuse of discretion. See United States v. Apker, 705 F.2d 293, 308 (8th Cir. 1983), cert. denied, 465 U.S. 1005 (1984). The mere fact that evidence is admitted as to one defendant that would not be admissible as to others does not constitute prejudice. See United States v. Helmel, 769 F.2d 1306, 1322 (8th Cir. 1985) ("A defendant is not entitled to severance simply because evidence may be admissible as to one defendant but not as to another, nor is he entitled to relief merely because the evidence against his co-defendant is stronger.")

After the court dismissed the conspiracy count against Susan McDougal, she asked for a mistrial because of the provisional admission of co-conspirator hearsay. At that time, counsel stated he had not had time to identify specific instances of objectionable testimony. The court responded that there was no such evidence affecting Susan McDougal:

> That's why you prevailed [on the motion to dismiss the conspiracy count], because the evidence was deficient. If there had been evidence in the record showing that she had agreed to participate in that conspiracy, she would still be a defendant relative to count one. So you can't have your cake and eat it too.

Susan McDougal's counsel asked for a general cautionary instruction "to say they are not to consider any of those statements as against Susan McDougal in any way." The court denied this request as too vague and asked Susan McDougal's counsel to identify specific testimony as to which she requested cautionary instructions. The district judge said that if Susan McDougal tendered an appropriate instruction, he would give it at the instruction phase of the trial. Susan McDougal's list of proposed instructions did not

include any request for a <u>Bell</u> instruction about co-conspirator hearsay.  In the order dealing with post-trial motions, the court stated:  "Susan was unable to identify any specific evidence which she believed to be improperly admitted and which prejudiced her."  The court instructed the jury that Count I against Susan  McDougal had been dismissed and that the jury must consider each defendant and each charge separately.

Of the fifty-eight claimed instances of co-conspirator hearsay, Susan McDougal admits that she made no contemporaneous objection to forty-six.  The government contends that she actually made a <u>Bell</u> objection in only four instances and made a general hearsay objection in five other instances.[9]

Regardless of whether Susan McDougal preserved her objection to four or nine (the government's position) or twelve instances (McDougal's position) of co-conspirator hearsay, we will not reverse the court's refusal to grant a mistrial, as the testimony was not prejudicial to Susan McDougal.  Only six of the items in the list of fifty-eight pertain to the Master Marketing transaction, and there was no objection whatsoever to these items.  Each of those six bits of testimony recounts a request or an offer or the response to a request or offer, rather than a statement offered for its truth.[10]  <u>See</u> <u>United</u>

---

[9]Susan McDougal's brief complains of <u>seven</u> instances in which she objected, but the district court failed to give a cautionary instruction at the time of conditional admission of co-conspirator hearsay, as required under <u>Bell</u>.  We have reviewed each of the instances Susan McDougal cites.  We observe that though Susan McDougal may have made hearsay objections, in some of the instances she cites she did not specifically ask for cautionary instructions under <u>Bell</u> at the time the evidence was admitted.  In two instances, the court admitted the testimony as non-hearsay, rather than under the co-conspirator hearsay exception.

[10]The items consist of:  two instances of David Hale stating that Jim McDougal asked him for a loan for himself and Governor Clinton to be put in the name of "Susan's advertising company;" David Hale said Clinton asked that his name be kept off the loan and McDougal assured him it would be; Hale said McDougal called and told him he would need to increase the loan from $150,000 to  $300,000; and Hale said McDougal asked to substitute the new loan application for the old.

States v. Robinson, 774 F.2d 261, 272-73 (8th Cir. 1985); Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992). Therefore, the only evidence relevant to the counts of conviction is non-hearsay. Bell does not apply if the evidence was admissible independently of the co-conspirator hearsay rule. See Robinson, 774 F.2d at 273 (Bell inapplicable where evidence admitted on grounds other than co-conspirator hearsay exception.). Moreover, Susan McDougal did not preserve her objections to the relevant items, and they certainly do not rise to the level of plain error. See United States v. Olano, 507 U.S. 725, 732-735 (1993); United States v. Abrams, 108 F.3d 953, 955 (8th Cir. 1997).

The testimony and exhibits that did not pertain to the Master Marketing loan simply did not prejudice Susan McDougal.[11] Consequently, the district court did not abuse its discretion in denying Susan McDougal's motion for mistrial on account of co-conspirator hearsay.

As to the submission of the unredacted indictment to the jury, Susan McDougal is in no position to complain. The government offered to redact the indictment, and her counsel rejected the offer, saying that he had no objection to the jury seeing the indictment, but that neither the government nor the court had "authority" to redact the indictment.

---

[11]Susan McDougal relies on United States v. Baker, 98 F.3d 330, 335 (8th Cir. 1996), cert. denied, 117 S. Ct. 1456 (1997), in which we held that the district court erred in failing to sever the defendant's case from that of his co-defendant. There, evidence came in to the co-defendant's case that was not admissible against the defendant, yet implicated him in the crime for which he was convicted. Baker is not relevant to Susan McDougal's case because the hearsay in this case did not pertain to the transaction for which Susan McDougal was convicted.

## III.

Susan McDougal also argues that in addition to the co-conspirator hearsay, there was other evidence of extraneous acts of wrongdoing by James McDougal and Tucker which had an inevitable spillover effect on her. She catalogs some eleven statements, all of which she admits were the subject of cautionary instructions.

Admission of evidence against one defendant which is inadmissible against another does not necessarily violate the latter's rights. See United States v. Delpit, 94 F.3d 1134, 1144 (8th Cir. 1996); Helmel, 769 F.3d at 1322. Limiting instructions informing the jury of the proper use of the evidence are sufficient, unless the defendant shows his defense is irreconcilable with other defendants' defenses or the jury cannot compartmentalize the evidence. See United States v. Bordeaux, 84 F.3d 1544, 1547 (8th Cir. 1996). Here, the record shows little danger of jury confusion. The evidence Susan McDougal complains of was not relevant to the Master Marketing transaction for which she was convicted. See United States v. Flaherty, 76 F.3d 967, 972 (8th Cir. 1996) (statements not actually incriminating to defendant; no prejudice and no right to severance). Moreover, the jury's acquittal of Tucker on five counts and James McDougal on one count indicates the jury was in fact able to separate wheat from chaff. See id.; United States v. Williams, 97 F.3d 240, 244 (8th Cir. 1996) (fact that jury did not convict on every count shows ability to compartmentalize).

## IV.

Susan McDougal raises a number of jury instruction issues. When an objection to jury instructions is properly preserved, we review the district court's decision for abuse of discretion. See United States v. Lynch, 58 F.3d 389, 391 (8th Cir. 1995). We will affirm if the instructions, taken as a whole, fairly and adequately convey the law applicable to the case. See id..

-18-

Susan McDougal contends that Jury Instruction 24A-1 instructed the jury that no scienter was necessary to convict her. The record shows an unfortunate grammatical error crept into Instruction 24A-1, the definition of "knowingly." The instruction was taken from Ninth Circuit Instruction 5.06 (recommended by the Eighth Circuit Committee on Model Instructions, see Eighth Circuit Manual of Model Jury Instructions (Criminal) at § 7.03 (1996)), which says:

> An act is done knowingly if the defendant is aware of the act and does not act *[or fail to act]* through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that [his] [her] acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly. (Emphasis added)

The instruction as given modified the first sentence as follows: "An act is done knowingly if the Defendant is aware of the act and does not act, or fails to act, through ignorance, mistake or accident." (Emphasis added). By setting off "or fails to act" with commas and putting "fails" in the present tense, Susan McDougal argues that the instruction takes the verb "fail" away from the negative in "does not act or fail to act." She contends that this makes "fails to act" an alternative predicate with no negative at all. Therefore, Susan McDougal argues, the jury was instructed that "an act is done knowingly if the defendant . . . fails to act through ignorance, mistake or accident," and thus allowed conviction for omissions without scienter.

Susan McDougal objected to Instruction 24A-1 on another ground, but did not mention the grammatical error. We therefore review only for plain error affecting substantial rights and resulting in a miscarriage of justice. See United States v. McKnight, 799 F.2d 443, 447 (8th Cir. 1986).

The addition of the commas and the "s", when dissected and diagramed, might change the meaning in the way Susan McDougal suggests, but we believe it was more

likely simply to render the sentence incomprehensible to the jury. Moreover, even assuming the jury could have parsed the sentence as Susan McDougal contends, the instruction would only convey misinformation about scienter in case of omissions, that is, failure to act. Susan McDougal was not accused or convicted of omissions. The error was thus irrelevant to the issues before the jury. Since the jury was elsewhere adequately instructed on intent, and since it is not usually necessary to define the word "knowingly," see United States v. Johnson, 892 F.2d 707, 710 (8th Cir. 1989), we conclude that the instructions as a whole were not misleading. We see no plain error.

Susan McDougal also attacks the second sentence of Instruction 24A-1, which states: "The government is not required to prove that the defendant knew that his or her acts or omissions were unlawful." She contends that this conflicts with the aiding and abetting instructions, requiring that the defendant "[knew] the offense was being committed or going to be committed." The argument is frivolous. The first instruction means that the defendant need not know the law prohibits his act, and the second means that he must nevertheless understand the nature of his act. These two ideas are not inconsistent.

Susan McDougal contends that the court should have given an instruction directing the jury not to consider James McDougal's testimony against Susan McDougal. Susan McDougal received limiting instructions about parts of James McDougal's testimony that were not admissible against her. As for the rest of James McDougal's testimony, Susan McDougal gives no reason for excluding it other than that it was "prejudicial."[12] The mere fact that a witness is a co-defendant does not

_____

[12]Susan McDougal relies on inapposite cases such as United States v. Thomas, 987 F.2d 697, 703 (11th Cir. 1993), dealing with the question of whether a Fed. R. Crim. P. 29 motion for acquittal must be decided on the basis of the government's case in chief or whether the court can consider subsequent testimony adduced by co-defendants. Such cases have no bearing on the issue of whether, the court having properly denied a Rule 29 motion, the jury may consider co-defendant testimony. See

make his testimony inadmissible.  See Zafiro v. United States, 506 U.S. 534, 540 (1993); United States v. Lyons, 53 F.3d 1198, 1204 n.5 (11th Cir.), cert. denied, 116 S. Ct. 262 (1995).  We see no abuse of discretion in the district court's decision to deny the instruction.

## V.

Susan McDougal next argues that her Fifth Amendment rights were violated by prosecutorial reference to the possibility of her testifying or putting on other evidence and by expert and lay testimony that the handwriting exemplars she gave to the FBI were not her normal handwriting.  A prosecutor's misconduct calls for mistrial if the prosecutor's remarks were not only improper, but so affected the defendant's substantial rights as to deprive him of a fair trial.  See United States v. Emmert, 9 F.3d 699, 701 (8th Cir. 1993), cert. denied, 513 U.S. 829 (1994).  We review the district court's denial of mistrial for abuse of discretion.  Id.

The Fifth Amendment prohibits a prosecutor from commenting on the defendant's failure to testify.  Id. at 702.  An indirect or ambiguous comment may violate the defendant's privilege not to testify if it shows the prosecutor meant to allude to the defendant's failure to testify or if the jury would naturally and necessarily understand it to be such an allusion.  Id.

We have reviewed the record excerpts Susan McDougal cites and we cannot conclude either that they manifest an intent to comment on Susan McDougal's failure to testify or that the jury would necessarily construe them as such a comment.

---

United States v. Lyons, 53 F.3d 1198, 1204 (11th Cir. 1995), cert. denied, 116 S. Ct. 262 (1995).

As for comments that allude to the possibility of the defendants calling witnesses other than the defendants, Susan McDougal has not shown that they were improper. A prosecutor may not comment on the defendant's failure to call witnesses to rebut the government's proof of a fact if the defendant alone had the information in question. See Richards v. Solem, 693 F.2d 760, 766 (8th Cir. 1982), cert. denied, 461 U.S. 916 (1983). Here, the statements were brief; they were made to the court or by the court in the context of disputes about the scope of cross-examination, and evidentiary disputes; they did not refer to information in the sole possession of Susan McDougal; and they have no tendency whatever to confuse the jury about the government's burden of proof. There was no abuse of discretion in denying a mistrial on the grounds of these comments.

Requiring a defendant to give a handwriting exemplar and introducing samples of the defendant's handwriting at trial do not violate the Fifth Amendment privilege against self-incrimination. See Gilbert v. California, 388 U.S. 263, 266-67 (1967). The handwriting itself (as opposed to the content of a written statement) is physical, not testimonial evidence. Id. Further, evidence that the defendant attempted to disguise his or her handwriting is also permissible, since otherwise the defendant could frustrate the government's right to obtain a sample. See United States v. Shively, 715 F.2d 260, 268-69 (7th Cir. 1983), cert. denied, 465 U.S. 1007 (1984); United States v. Stembridge, 477 F.2d 874, 876 (5th Cir. 1973). See also United States v. Jacobowitz, 877 F.2d 162, 169 (2d Cir.), cert. denied, 493 U.S. 866 (1989). Susan McDougal has given us no reason to question the wisdom of these rules or to doubt their applicability in her case. We therefore reject her argument.

## VI.

Finally, Susan McDougal argues that the cumulative effect of all the errors she alleges deprived her of a fair trial. None of her arguments was strong individually, and they therefore gain little from aggregation.

-22-

We affirm the convictions.


A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.